JACKSON, MORRIS & CO. v. NIMMO & THORNHILL.

CONSTITUTIONAL LAW.   *Chancery Courts.   Increased Jurisdiction.*   The Act of the Legislature, passed March 23, 1877, conferring jurisdiction on the chancery courts of " all civil causes of action now triable in the circuit court, except for injuries to person, property or character, involving unliquidated damages," is constitutional.

FROM SUMNER.

Appeal from the Chancery Court at Gallatin   GEO. E. SEAY, Ch.

JOHN J. VERTREES for complainants.

———————— for defendants.

FREEMAN, J., delivered the opinion of the court.

The act of the Legislature, passed March 23, 1877, entitled "An act to increase the jurisdiction of the chancery court," is as follows:

"That jurisdiction of all civil causes of action now triable in the circuit court, except for injuries to per-

son, property or character, involving unliquidated damages, is hereby conferred upon the chancery court, which shall have and exercise concurrent jurisdiction thereof along with the circuit court."

Sec. 2 is: "That from and after the passage of this act, no demurrer, for want of jurisdiction of the cause of action, shall be sustained in the chancery court except in cases of unliquidated damages for injuries to person, property or character."

The intention of the Legislature is plainly expressed. It is to *increase* the jurisdiction of the chancery court. That increase is to be effected by giving the chancery court jurisdiction, concurrent with the circuit court, of all causes of action now triable in the circuit court, except injuries to person, property or character, involving unliquidated damages. This statement of what is the intention of the Legislature, taken from the language of the act, of itself is so clear and plain that we cannot misunderstand it, and find no need for the application of rules of construction. It cannot be made clearer or plainer than the act has made it.

The question for investigation, and the one on which whatever of difficulty there is hinges, is the law in accord with the Constitution of the State? If it is, then the courts have but one duty to perform, after ascertaining its meaning, that is, to enforce it.

The policy of the enactment is not the question. That can have but little if any influence upon the action of this court. The policy of a statute, or its injurious tendencies, may legitimately be looked to on the question of whether the language shall receive a

liberal or strict construction. But this aspect of a law has no bearing of any perceptible weight on the question of the accord of the law with the Constitution. That must be ascertained, under our system of written constitutions, when the law is to be tested by the Constitution of the State, by finding in the Constitution an express prohibition to the exercise of the power under which the law is enacted, or a fairly implied prohibition, to be derived from a just construction of such express prohibitions as may be found in that instrument. 8 Heis., 686.

We may assume it to be axiomatic in American constitutional law, that State Legislatures, representing the soverignty of the people, have all legislative or law-making power, not prohibited by the Constitution of the United States or the Constitution of the particular State, either expressly or by necessary and fair implication.

This conceded, what are the provisions of the Constitution of the State bearing on this question? They are but few, and not difficult of construction it might seem, yet on close inspection may present in some of their aspects a very wide field for discussion.

The first is art. 6, sec. 1, it is: "The judicial power of this State shall be vested in one Supreme Court, and in such circuit, chancery and other inferior courts, as the Legislature shall, from time to time, ordain and establish, in the judges thereof and in justices of the peace." Then follows provisions as to the constitution of the Supreme Court, with its jurisdiction, the mode of election of the judges, both of

supreme, circuit and chancery courts; in a word, the whole machinery of the system, so far as deemed necessary at the time, is provided for, and the system completed.

The 8th section of the same article of the Constitution is then added in these words: "The *jurisdiction* of the circuit, chancery and other inferior courts shall be as now established by law, *until changed* by the Legislature."

The first section quoted is simply the distribution of the judicial power of the State by establishing or directing there shall be a Supreme Court, circuit, chancery and other inferior courts, and justices of the peace, in which tribunals this power shall be lodged and exercised. Beyond question this system of courts is established and ordained by the Constitution as constituting the judicial department of the government.

In ascertaining what was intended by the convention by the terms used, we must, it is true, as said by the Court of Appeals of New York, "keep in mind that the Constitution was not framed for a people entering into political society for the first time, but for a community already organized and furnished with legal and political institutions adapted to all, or nearly all, the purposes of civil government, and that it was not intended to abolish these institutions, except so far as they were repugnant to the Constitution then framed. It would be impossible to understand from the terms used in the Constitution alone what was meant or intended by "circuit courts," but by reference to our existing institutions, and the laws

regulating them, as well as the history and traditions of our State, we readily know that this is a court of law as contradistinguised from a court of chancery; that the one administered its remedies and enforced the rights of the citizen by the machinery or forms of what was and is known as the forms of law, and the other did the same thing within its sphere of action by the forms and machinery known as the mode of procedure as a court of chancery. The one used the declaration, stating the cause of action by the plaintiff, with pleas traversing or denying, confessing or avoiding the cause of action stated, and so on by successive steps until an issue was made between the parties, and this issue was decided for or against the parties under prescribed regulations, and judgment rendered accordingly. The other proceeded by bill or petition, with answer by defendant, with other incidental steps; the case was heard and decided by the chancellor, and a decree adjusting the rights of the parties, both complainant and defendant, and then enforcing such decree by appropriate orders or process. Thus, by reference to the state of things existent at the time, we are able to get a pretty clear knowledge of the mind of the convention when they used the terms "circuit and chancery courts."

The law under discussion must, then, be tested by its accord with the Constitution, understood by the light of the existent state of things at the time and previous to the adoption of the Constitution. It is an enactment of the Legislature of the State, and is operative unless in violation of the express terms, or

fairly implied provisions of that instrument. No ex-
press prohibition to its enactment is found. It can
only be attacked, then, by finding a clearly implied
or fairly inferred prohibition. This is to be made
out from the language quoted distributing the judicial
power, that is, that "it shall be vested in such cir-
cuit, chancery, and other inferior courts as the Leg-
islature shall, from time to time, ordain and establish."
The conclusion sought involves the affirmation of the
proposition that this language, by fair and just impli-
cation, fixes and defines the limits of the jurisdiction
of these courts. This must be so, for if it does not
fix or define the limits of jurisdiction, then the Leg-
islature could not have violated its requirement by in-
creasing the jurisdiction of the chancery court, that is,
simply extending the sphere of the powers of that
court. This is a legitimate exercise of the law-making
power, unless some limit is prescribed to its exercise
by the Constitution. There being, as conceded, no
express prohibition on this power in the Constitution,
the inferential prohibition must be had from the ar-
ticle cited. This inference necessarily involves the idea
that the true limitations upon the jurisdiction of these
courts may be ascertained from the language used by
reference to the words used, or from their fair con-
struction in the light of existent things at the time
of the adoption of the Constitution. The proposition
to be maintained is, the law is prohibited by the lan-
guage, or fair implication drawn from it, of the Con-
stitution. The language contains no prohibition that

reaches the question, the implication must, or the proposition fails.

The theory on which the argument must rest is, that the constitutional establishment or recognition of the chancery court, necessarily or by fair implication, involves the proposition that this court, with its then defined jurisdiction, was the purpose of the convention, that is, that by the clause of the Constitution not only is the judicial power distributed and courts mentioned ordained, but the jurisdiction of these courts also defined and their limits fixed. The only conceivable limit that could be fixed on their jurisdiction by the simple fact of their ordination would be that which they then possessed, for the inference must be drawn or implication made from their designation as circuit and chancery courts, and the idea that is conveyed by these terms in connection with the actual fact of the existence and traditions appertaining to that existence in our State polity at the time.

In order to make this influence effective to defeat the law before us, there must be derived from this section of the Constitution not only the existence of such courts, but also a fixed and defined boundary, either in fact or with reasonable certainty to be ascertained, or else there could be no violation of the constitutional jurisdiction that would invalidate an enactment of the Legislature either increasing or changing the limits of that jurisdiction; an undefined limitation would be impossible to be enforced, for its boundaries could not be ascertained so as to mark the point when the Legislature trespassed upon the constitutional inhi-

bition.   This seems too clear for doubt or argument.
The limit must be fixed, the boundaries of this juris-
diction defined by the language of this section, or else
the Legislature is free to act as it may deem the
public interest shall require.   As we have said, we
think the only conceivable limit that can be with any
plausibility inferred in the case is, that the jurisdic-
tion then possessed and exercised by the chancery court
was intended to be fixed and established as its con-
stitutional jurisdiction.   From this view it would follow,
however, that there could be no change in that juris-
diction after the adoption of the Constitution, certainly
none by the Legislature, unless we assume that a
change or alteration could be made by the Legisla-
ture in the Constitution itself, or that body have the
right to give or take away what was prohibited or
not given by the Constitution.   This will not be
claimed.   This proposition involves, then, the fixed-
ness for all time of the jurisdiction of this court, a
constitutional congelation of the unstable elements of
jurisdiction into a defined mass that cannot be dimin-
ished or enlarged by legislative action.

In this we think the argument would prove more
than its advocates would be willing to maintain.   The
chancery court has been steadily advancing and widen-
ing the boundaries of its jurisdiction from its earliest
history down to the present day.   We need but refer
to the familiar contest between Lord Coke and Elles-
mere, in the days of James, as to the power of a
court of chancery to enjoin parties from proceeding at
law, in which the power was stoutly denied by Coke,

and as earnestly insisted on by the Chancellor. The court of chancery, as we know, succeeded in maintaining its ground, and thereby established its enlarged jurisdiction. Our books are full of such instances, familiar to any lawyer. Was it intended to stop and put an iron barrier in the way of the development of this source of jurisdiction of this court? We apprehend it will hardly be so contended, yet the argument inevitably leads to this, for if the Constitution has fixed, by any ascertainable limits, the jurisdiction of the court, then the court could no more increase or accrete jurisdiction than could the Legislature confer it. The one would be as much bound by the Constitution as the other. To both the Constitution is the supreme law before which they must yield. The limits of jurisdiction must be fixed or ascertainable, or else no law can be held to violate the Constitution that enlarges these limits.

Again, the circuit court is ordained and established in the precise same language as is the chancery court, and the same rules would have application. Is the jurisdiction of that court to be held to have been unalterably fixed by the Constitution too? Must we look to the jurisdiction then possessed by that court, and hold that no more can be given it either by the Legislature or by construction of law, or rather by the gradually encroaching principles inherent in our system, by which the courts themselves extend their jurisdiction to meet the wants of a wiser and more enlightened public policy, when such necessity is developed by experience?

We need not refer particularly to cases illustrative of this principle. We only mention such as the recovery on a lost note, or the half of a bank note, where the jurisdiction was formerly alone in equity, and the defense by a surety, when a lien or security taken for the debt has been released or lost by the creditor to his injury, where the remedy or defense is now allowed at law as well as in equity.

We need not reason further on this aspect of the question. The Constitution, we think, has settled it in unmistakable terms. The language of the 8th section of the same article is: "The jurisdiction of the circuit, chancery, and other inferior courts, shall be as now established by law, until changed by the Legislature.". If the convention had stopped at the first clause of this section, it would have been precisely the provision which would have sustained the argument. The jurisdiction of all these courts would have been unalterably fixed within the limits as then defined and ascertainable by the then existent law. But we are compelled to give effect to the other clause. It is equally a part of the Constitution, that is, until changed by the Legislature. This language must be taken, as other language, to mean what it says, and a fair construction of it be given. It can only mean, we think, that there was no change made, or intended to be made, by the convention in the then existent jurisdiction of these courts, but that such change of jurisdiction, that is, enlargement or diminution of their sphere of action, was to be left, and was authorized to be made by the Legislature.

To hold otherwise would be not only to disregard the plain meaning of the language used, but also to involve us in consequences that would be most serious. The language, as is seen, applies not only to the circuit and chancery courts, but to all other inferior courts then existent among us. If the jurisdiction of the chancery court is unalterably fixed by the Constitution in any way, then unless this clause authorizes that jurisdiction to be changed, the jurisdiction of the circuit and other inferior courts would be equally fixed, and must so remain. But this clause most certainly authorizes the Legislature to change the jurisdiction of the other courts, and if so, it equally authorizes the change of the jurisdiction of the chancery court, and that is all that is done in the act under consideration.

This section serves to guide us clearly as to what elements of the complex ideas embraced in the words "circuit and chancery court" were in the mind of the convention, and intended to be imbedded in the Constitution and put beyond legislative action or change. These words have at least two, if not more, distinct facts or elements which are conveyed when we speak of these courts: one is of the one or the other court, with a judge or chancellor performing the judicial functions by means of certain forms or machinery in a certain mode, that is the one, as we have said, by the forms known as common law procedure; the other, that known as the chancery form of procedure. These elements or phases of the idea of a circuit or chancery court are not only separable and distinct in thought,

but equally so in fact, from the other element of jurisdiction or power to act judicially on a greater or less number of rights. While it is conceded that jurisdiction is an essential element for the action of a court, yet it is equally a court, whether that jurisdiction be over many or few questions or subjects of judicial action. The extent or narrowness of the jurisdiction exercised does not at all go to the idea of its existence intact, but only its efficiency to perform a larger or smaller function as an agency of government. This hardly need be illustrated. The court of chancery was as much a court of chancery in the days when its jurisdiction was confined to a few subjects as it is now, since its jurisdiction has, by gradual encroachment and accretion, been extended so as to embrace in some form the largest mass of the questions passed upon by our courts. In view of this we think it clear, from the first and eighth sections of the article from which we have quoted, that the preservation of these courts, with their distinctive features, modes of procedure and organism, substantially as independent and separate agencies for the exercise of the judicial power was intended—the courts to remain intact. But the matter of their jurisdiction is not so fixed, nor was it so intended. This was to remain as then until changed by the Legislature. To what extent the jurisdiction thus left under control of the Legislature may be changed, we could not definitely determine. The existence, however, of these courts as parts of the judicial power of the government, is beyond the power of the Legislature to de-

stroy. The courts are to be preserved intact, but what shall be the matter over which they shall exercise their powers subject to certain limitations involved in other clauses of the Constitution, is left to legislative discretion.

The distinction attempted to be pointed out is between the existence of a court as a concrete fact, and the jurisprudence which that court administers by the agencies of its organism. This distinction is found underlying the definition of equity jurisprudence as given by our standard writers. Judge Story says, in defining the distinctive features of equity jurisprudence: " In England and the American States, which have derived their jurisprudence from that source, equity has a restrained and qualified meaning. The remedies for the redress of wrongs, and for the enforcement of rights, are distinguished into two classes: first, those which are administered in courts of common law; and secondly, those which are administered in courts of equity. Rights which are recognized and protected, and wrongs which are redressed by the latter courts only, are called equitable rights and equitable injuries. Equity jurisprudence may, therefore, properly be said to be that portion of remedial justice which is exclusively administered by a court of equity, as contradistinguished from that portion of remedial justice which is exclusively administered by a court of common law." From this the distinction is very clear, and the ideas of the court which administers, and the jurisprudence to be administered, and the jurisdiction exercised, is clearly seen. The court must necessarily be existent

before it can exercise jurisdiction at all, so that it is a separate and independent thing, both in thought, logic and fact, from the matter of its jurisdiction. This may be more or less extensive, may fluctuate, be enlarged or diminished, and yet the court remains, as we have said, the same organic thing, ready to the work that may be assigned it, whether much or little.

We have discussed this question in its affirmative aspect thus far mainly. We turn for a moment to some of the limitations to the power of the Legislature, fairly implied and deduced from other portions of the Constitution, as well as from what we have maintained in this opinion. The courts mentioned are to be kept intact as organic judicial machinery of the State. Criminal cases cannot be transferred to the jurisdiction of the chancery court, because the Constitution has provided for indictment or presentment and a trial by jury, with the witnesses for the State to confront the defendant. A court of chancery by its organization can never perform these functions, therefore such questions cannot be included within its jurisdiction. Other cases may exist, but they do not occur to us at present, nor would such limitations be attempted to be marked more definitely in this opinion.

The act under consideration seems free from all objections. It does not deprive the circuit court of any of its jurisdiction—leaves that precisely where it stood before. It only adds to the jurisdiction of the court of chancery by giving it concurrent jurisdiction over all civil cases except those specially mentioned as excluded. In fact, it has but gone one step further

Jackson v. Nimmo.

than was the law before. In any civil case the complainant could have filed a bill in the court of chancery, and if no demurrer to the jurisdiction was interposed, and an answer put in, the court's jurisdiction was fixed, so that the consent of the parties really gave the jurisdiction, and so the law stood when the Constitution was adopted. Now the complainant has the option as to the tribunal in which he will have his case tried. Before that the option was with the defendant; that is practically all that has been done by the act. We can see no very dangerous innovation in this, certainly no infringement of constitutional prohibition.

It is maintained, however, that the act is proposed to change the character or to destroy the chancery court. We are totally unable to see the force of this objection, or to perceive any such purpose. As to the purpose, it cannot be derived from the act itself. The contrary purpose would seem to be the only legitimate inference, that is, to build up and enlarge the sphere of action of this court. It is difficult to see how it can be maintained that an enlargement of the jurisdiction of this court is evidence of any purpose to destroy or weaken it. This is an argument that would strangely contrast with the history and growth of the chancery court, which has steadily, by accretion, been extending its jurisdiction from the earliest periods to the present time. This has been understood heretofore to have been a continued increase and addition to its vigor, but, if the argument is sound, would be only evidence of its de-

cay, and tend to its ultimate destruction. Certainly increase of jurisdiction in this way cannot have the effect to invigorate, while a similar enlargement by an act of the Legislature is to have or be evidence of a purpose to attain an opposite result.

But it is maintained that this involves in some way the power to destroy the chancery court, or to turn it into a court of law. We do not see this result any more than we can see evidence of such a purpose on the part of the Legislature. The exercise of the power to increase the jurisdiction of a court, thereby giving it a more enlarged field of operation, does not involve the power to do the opposite, that is, to destroy. Whenever any law shall be passed with any such purpose, or any direct tendency to produce this result, we shall promptly strike it down as in violation of the Constitution which establishes this court. But seeing no such purpose in this act, we cannot arbitrarily assume it to exist.

It is said the clause of the Constitution providing that the jurisdiction of the court shall remain until altered by the Legislature, was only intended to secure the jurisdiction as it was—rebut the idea of change. This cannot be, for two reasons: first, the jurisdiction of these courts would have remained as it then stood without this clause: second, all laws are expressly kept in force not inconsistent with the Constitution by another clause. To give this clause any meaning, it must be held a reservation of power to alter the jurisdiction of the courts established, and as

a matter of course to enlarge or diminish, or else there could be no alteration.

The only other objection to be noticed is, the objection that by conferring the jurisdiction here given on the chancery courts, the right of trial by jury is impaired, as guaranteed by article 6 of the Bill of Rights.

Several conclusive answers may be given to this. First, if the power to enlarge and alter the jurisdiction is given in the Constitution, whenever it is rightfully conferred on the chancery courts, then that jurisdiction may be exercised according to the forms by which such courts are accustomed to administer remedies. This article in the Bill of Rights was never understood to apply to the administration of the law in such courts, and it has been held so in many other cases, such as formerly in cases of bastardy. *Kirkpatrick* v. *The State*, Meigs, 124.

But the conclusive reply is, that under the law as it stood at the adoption of the Constitution, and at present, the party may, at his option, have a trial by jury of all matters of fact arising in his case in a court of chancery. The act of 1846, and sec. 4465 of the Code, gives this right to either party in the amplest manner, the law being "that either party to a suit in chancery is entitled to a jury to try and determine any material fact, and all the issues of fact in any case shall be submitted to one jury." In the case of *James* v. *Brooks*, 6 Heis., 151, it is expressly held that the verdict of the jury in chancery cases is entitled to the same weight precisely as in a court of

law, and may be set aside in the same way, and when reversed in this court for error, the case is to be remanded for new trial in the same way as if it had been a jury trial at law.

As either party can have a jury trial at his option, his right cannot be held in any way impaired by having the trial in a chancery court; so that this objection has nothing in it, unless we say that the right to a jury trial is impaired in a case where the right may always and in any case be had, and that at the option of the party. This is all he could have in a court of law, for in that court he can at his option dispense with a jury, and submit his case to the court. If he chooses that his case shall be heard by a chancellor, certainly no one can seriously insist his right is impaired because he does not choose to avail himself of it.

As to the meaning of the act of the Legislature, we think it too plain and obvious to require discussion. We know what was meant, and if not in violation of the Constitution, it is our plain duty to enforce and carry out that meaning. The policy of the act is one with which we have nothing to do, and we shall not discuss it. We hold, therefore, the act to be constitutional, and the law of the land, and that the bill in this case can be maintained.

COOPER, J., dissented.