# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### June 24, 2008 Session

## CURTIS S. PERSON v. THE BOARD OF COMMISSIONERS OF SHELBY COUNTY, TENNESSEE, ET AL.

**Appeal from the Chancery Court for Shelby County**
**No. CH-06-2237-3     Kenny W. Armstrong, Chancellor**

---

**No. W2007-01346-COA-R3-CV - Filed September 28, 2009**

---

In 1967, the General Assembly passed a Private act consolidating the juvenile courts of Memphis and Shelby County by establishing a new court. The Act also provided for a second division, with the judgeship of that division to remain vacant until the County Commission determined the need for it. Almost forty years later, the Commission adopted a resolution approving the appointment of a judge to the second division of the court. The current judge of the Juvenile Court of Shelby County challenged the attempted creation of a second judgeship, arguing that the relevant portion of the Private Act constituted an unconstitutional delegation of the authority to ordain and establish courts, which power is reserved to the General Assembly by the Tennessee Constitution. Because a judge is a necessary component of a court, in order to "ordain and establish" a court under Art. VI, § 1, the legislation creating or establishing the court must make provision for a judge. The legislature cannot establish a court without also establishing a judgeship. Since Section 20 of the Private Act does not create or establish a judgeship for division 2, it did not effectively create or establish that division or court. Additionally, because in Section 20 of the Private Act the legislature delegated to the Commission the power to decide whether a judge for division 2 was needed, which is the equivalent of delegating to the Commission the authority to establish or create division 2 of the juvenile court, we conclude that Section 20 is an unconstitutional delegation of power reserved to the General Assembly by Art. VI, § 1 of the Tennessee Constitution and, therefore, reverse the trial court's holding on that issue. We affirm the trial court's ruling on Open Meeting Act claims based on a prior resolution that was promptly rescinded by the Commission.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment; Judgment of the Chancery Court Reversed in Part and Affirmed in Part**

PATRICIA J. COTTRELL, P.J.,M.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Lucian T. Pera, Brian S. Faughnan, Memphis, Tennessee, for the appellant, Curtis S. Person.

Leo Bearman, Jr., Emily Turner Landry, Memphis, Tennessee, for the appellees, The Board of Commissioners of Shelby County, Tennessee, et al., and A. C. Wharton, Jr., Mayor of Shelby County, Tennessee.

## OPINION

Juvenile Court Judge Curtis Person filed suit against the Mayor of Shelby County ("Mayor") and the Shelby County Board of Commissioners ("Commission") challenging a resolution passed by the Commission that resulted in a second juvenile court division. According to Judge Person, the private act relied upon by the Board and the resulting resolution were unconstitutional under Art. VI, § 1 of the Tennessee Constitution. In addition, Judge Person alleged that the resolution passed by the Commission violated the Open Meetings Act, Tenn. Code Ann. § 8-44-101 *et seq*.

The following facts are not in dispute. In 1967, the General Assembly passed Chapter 219 of the Private Acts of 1967 ("Private Act") which purported to accomplish two objectives relevant to this case. First, the Private Act established the Juvenile Court of Memphis and Shelby County in Section 1, which provides in pertinent part as follows:

> *Be it enacted by the General Assembly of the State of Tennessee*, That there is hereby created and established in and for the City of Memphis and County of Shelby, Tennessee, a Court with the title and style of Juvenile Court of Memphis and Shelby County, Tennessee. Such Court shall be a Court of Record, presided over by a judge who shall have the qualifications hereinafter provided, and whose salary shall be provided and paid as hereinafter provided. Such Judge shall be known and have the title of Judge of the Juvenile Court of Memphis and Shelby County and shall devote his full time to the duties of such office of Judge, and shall have no other professional activity;

The Private Act provided in Section 6 that the judge who was then judge of the Memphis Municipal Juvenile Court would become the judge of the Juvenile Court of Memphis and Shelby County until a successor was selected. This is the position currently held by Judge Person.

The Private Act also addressed a second division of the court in Section 20,[1] which provides as follows:

> *Be it further enacted*, That there is hereby created a Second Division of the Court. The Judge of said Division shall be subject to all of the provisions of this Act in the same manner **as is the Judge provided for in this Act**. The **Judgeship of said Second Division shall remain vacant until the Quarterly County Court of Shelby County shall determine the need therefore** (sic) and by resolution set a date for the

---

[1]The Private Act also included a severance provision in Section 26 such that if one of its provisions is found to be unconstitutional, the remainder of the Private Act continues in full force and effect.

election or appointment of said Judge. The Judge of the Second Division shall be learned in the law and licensed to practice law in this State. (emphasis added).

Since enactment of the Private Act in 1967, the second division has not come into existence. The Juvenile Court of Memphis and Shelby County has operated for over 40 years with a single division and a single judge.

On November 6, 2006, the Commission passed a resolution to recognize the need for and to approve the second division ("November Resolution") referenced in Section 20 of the Private Act.[2] Ten days later, Judge Person filed suit, claiming that the Commission violated the Open Meetings Act in the enactment of the November Resolution and seeking a declaratory judgment under Tenn. Code Ann. § 29-14-102 *et seq.* that Section 20 of the Private Act was unconstitutional. Upon filing of the complaint, Judge Person received permission from the trial court to conduct expedited discovery to determine whether the Commission had violated the Open Meetings Act. Shortly thereafter, the Commission unanimously rescinded the November Resolution on November 20, 2006.

After the Commission rescinded the November Resolution, the trial court granted defendants' motion to quash the expedited discovery, finding that the Open Meetings Act allegations were moot. There was no judicial determination as to whether the Open Meetings Act had been violated.[3] The lawsuit was not, however, dismissed pending resolution of the claim that Section 20 of the Private Act was unconstitutional.

On February 5, 2007, the Commission passed a revised second resolution recognizing the need for and approving a second division under Chapter 20 of the Private Act ("February Resolution"). According to the February Resolution, the Private Act had created two divisions but only one judgeship. The resolution went on to state that the Private Act authorized the second division judgeship to be filled by the Commission when the Commission deemed it was needed. Consequently, the February Resolution[4] provided as follows:

That the need to implement and appoint a judge to the already created and established Second Division of Juvenile Court of Memphis and Shelby County, Tennessee be and the same is hereby approved.

Judge Person then renewed his request for a temporary injunction to prevent appointment of a judge to the second division pursuant to the February Resolution based upon the

[2] No one disputes the fact that the Commission is the same body described as the "Quarterly Court" in Chapter 20 of the Private Act.

[3] According to Judge Person's brief, one of the Commission members publically acknowledged the Open Meetings Act had been violated.

[4] The rescinded November Resolution was not so artfully drafted and provided "That the creation of a Second Division of Juvenile Court of Memphis and Shelby County, Tennessee is deemed necessary and is hereby approved."

unconstitutionality of Chapter 20. There is no allegation that the Commission violated the Open Meetings Act when it passed the February Resolution.[5] In February of 2007, the trial court granted Judge Person's temporary injunction request preventing the Commission from filling the judgeship in division two pending a decision on the merits.

The trial court subsequently found in a May 18, 2007 Memorandum Opinion that Section 20 of the Private Act was constitutional and lifted the temporary injunction. The trial court found that the legislature "clearly enacted and created" the second division in Section 20. The question, according to the trial court, was whether it was constitutionally permissible for the legislature to delegate to the Commission the power to decide when to fill the judicial position. The trial court relied on Tennessee cases on the delegation of legislative authority and found that delegation was permissible so long as there was not delegation of authority to adopt or not adopt a law or authority to create or not create a court. Finding that the legislature may delegate to the Commission the decision when to fill the judgeship position, the trial court concluded that Section 20 was constitutional. The trial court granted a stay of its judgment pending appeal, thus preventing the Commission from appointing a judge for division two.

Judge Person then filed this appeal on two grounds.[6] First, Judge Person argues that the trial court erred when it found Section 20 of the Private Act to be constitutional under the Tennessee Constitution. Second, Judge Person appealed the trial court's order which quashed Judge Person's discovery request upon the determination that the Open Meetings Act claim had been mooted by the Commission's decision to rescind the November Resolution. According to Judge Person, the trial court should have allowed discovery to proceed in order to determine whether the Open Meetings Act had been violated and what remedies would be appropriate.

Judge Person asked the Tennessee Supreme Court to assert jurisdiction over this appeal under Tenn. Code Ann. § 16-3-201, and that request was denied.

---

[5] The complaint contained additional allegations pertaining to defects in the November Resolution which Judge Person acknowledges were not in the February Resolution, thus rendering moot two counts in the complaint.

[6] The trial court did not make reference to any issue regarding Judge Person's standing to raise this constitutional challenge, and it is not raised by either party on appeal. Constitutional challenges to legislation creating courts is traditionally raised by litigants who have been subjected to the authority of constitutionally suspect courts. This is not to say, however, that litigants in challenged courts alone have standing to raise challenges under Art. VI, § 1. In *Shelby County Election Commission v. Turner*, 755 S.W.2d 774 (Tenn. 1988), the standing of the Election Commission was challenged when it filed suit seeking direction as to whether a vacancy existed in the office of Juvenile Court Clerk. The Supreme Court found that since such a determination was necessary to allow the Election Commission to carry out its ministerial duties, *i.e.*, preparation of ballot etc., then the Commission had standing. *Id.* at 776-77. Likewise, judges have duties regarding administrative aspects of the courts, including case management, supervision of court personnel, establishing rules for court administration. Tenn. Code Ann. § 37-1-212. *See* Op. Tenn. Atty. Gen. No. 07-04, 2007 WL 626705 (Tenn. A.G. Jan. 11, 2007). In order for a judge to perform these ministerial duties, it is necessary to know whether the Juvenile Court is composed of 1 or 2 divisions.

# I. STANDARD OF REVIEW

A trial court's rulings on questions of constitutional law are reviewed *de novo* by an appellate court. *Bredesen v. Tennessee Judicial Selection Comm.*, 214 S.W.3d 419, 424 (Tenn. 2007).

We must begin with the presumption that legislative acts are constitutional. *State v. Pickett*, 211 S.W.3d 696, 700 (Tenn. 2007) (citing *Gallaher v. Elam*, 104 S.W.3d 455, 459 (Tenn. 2003); *State v. Robinson*, 29 S.W.3d 476, 479 (Tenn. 2000); *Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn. 1997)). Consequently, to be found invalid, a statute must be plainly at odds with a constitutional provision. *Perry v. Lawrence County Election Comm'n*, 411 S.W.2d 538, 539 (Tenn. 1967). We have been directed to "indulge every presumption and resolve every doubt in favor of the statute's constitutionality." *Pickett*, 211 S.W.3d at 780 (quoting *State v. Taylor*, 70 S.W.3d 717, 720-21 (Tenn. 2002)). It is an "established rule of statutory construction that where one reasonable interpretation would render a statute unconstitutional and another reasonable interpretation would render it valid, courts are to choose the construction which validates the statute." *Bailey v. County of Shelby*, 188 S.W.3d 539, 547 (Tenn. 2006). Thus, a "heavy burden" is placed on one who attacks a statute. *Bailey*, 188 S.W.3d at 547; *Tennessee ex rel. Maner v. Leech*, 588 S.W.2d 534, 540 (Tenn. 1979).

# II. TENNESSEE CONSTITUTION

According to Judge Person, Section 20 of the Private Act is an unconstitutional delegation to the Commission of the power to establish inferior courts, which power is reserved exclusively to the legislature by Art. VI, § 1 of the Tennessee Constitution. This argument is based upon the fact that in Section 20 the General Assembly failed to provide for a judge for division 2 and left to the local governing body the decision of whether an additional court or judge was needed.

It is not disputed that the juvenile court is an "inferior" court which is governed by Article VI, § 1 of the Tennessee Constitution. *Shelby County Election Comm'n v. Turner*, 755 S.W.2d at 777. Article VI, § 1 provides in pertinent part as follows:

> The judicial power of this State shall be vested in one Supreme Court and in such Circuit, Chancery and other inferior Courts as the Legislature shall from time to time, ordain and establish; in the Judges thereof, and in Justices of the Peace.

Thus, "[t]he plain language of Article VI, § 1 indicates that it is the Legislature that must vest judicial power in the courts by 'ordaining and establishing' them." *Moses v. City of Jellico*, No. E2008-00004-COA-R3-CV, 2009 WL 167072, at * 3 (Tenn. Ct. App. Jan. 26, 2009) (no Tenn. R. App. P. 11 application filed). Where the existence of a court is the result of a delegation from the General Assembly to a local government such delegation is in "plain violation of the Constitution of Tennessee." *Haywood v. Davidson County Workhouse*, 259 S.W.2d 159, 162 (Tenn. 1953), *overruled on other grounds*, *Bankston v.* State, 908 S.W.2d 194 (Tenn. 1985); *Ellis v. State*, 20 S.W. 500, 502 (Tenn. 1892). The private act at issue in *Haywood* provided that "the Mayor and City Council shall by ordinance provide for a Juvenile and Domestic Relations Court." The Supreme

Court held that the private act "does **not create** the office of Juvenile and Domestic Relations Court but **delegates** to the Mayor and City Council the authority to do so." *Id.* at 161.

Similarly, in *Moses v. City of Jellico*, the court found that the private act in question "did not create, establish, or ordain the city court, but rather purported to delegate the authority to do so to the City," because the private act stated that "the city shall have the power to establish a city court and the office of city judge." 2009 WL 167072, at * 3. The court in *Moses* reaffirmed that "the General Assembly's authority to vest judicial power in a lower court may not be delegated to a municipality, but must be exercised directly by its legislation." *Id.*, at *5.

In light of this well-settled authority, all the parties in the case before us agree that only the legislature had the constitutional authority to create, or "ordain and establish,"[7] the second division of the juvenile court and that delegation of that authority to the Commission would be a violation of Art. VI, § 1. They disagree, however, on the interpretation and effect of the language in Art. VI, § 1 and that in Section 20 of the Private Act.

A good beginning for our analysis is a review of the historical antecedents of the reservation to the General Assembly of the power to create courts and vest them with judicial authority, as explained by Justice Drowota's concurrence in *Summers v. Thompson*, 764 S.W.2d 182, 188-99 (Tenn. 1988), *cert. dismissed*, 488 U.S. 977 (1988).[8] That eloquent and authoritative[9] discussion is quite helpful in illuminating the constitutional concerns and historical context of Art. VI, § 1.

The *Summers* concurrence, in its pertinent portions, reiterates two basic principles that are relevant to our determination of the issue before us. The first is that the constitutional parameters on the legislature's authority to delegate its power to create or establish courts are consciously founded upon the need to safeguard against political encroachments by local entities. Without diligence in guarding the General Assembly's prerogative, the independence of the judiciary is threatened, with consequences that undermine a cornerstone of our system of government.

The second principle is that courts cannot exist independently from the judges that preside over them. The term "court" as used in Art. VI, § 1 is not an abstract concept, but is meant to be

---

[7] Both parties argue at length whether and to what extent the use of the word "create" for division 2 in Section 20 and the use of the words "created and established" for division 1 in Section 1 bear on this controversy. We agree with the Commission that there is no meaningful difference between the Constitution's wording and that of the Private Act. Courts considering Art. VI, § 1 have used the terms "establish" and "create" interchangeably. For determination of the issue before us, the exact wording in the Private Act is less important than the result of that language.

[8] The issue before the court in *Summers* concerned whether judges on municipal courts could be terminated by the board of commissioners. 764 S.W.2d at 183-84.

[9] Justice Drowota's concurrence has gained prominence and has been favorably cited and relied upon numerous times by the Tennessee Supreme Court in subsequent opinions. *See State ex rel. Hooker v. Thompson*, 249 S.W.3d 331, 338 (Tenn. 1996); *Spurlock v. Sumner County*, 42 S.W.3d 75, 78 (Tenn. 2001); *State v. King*, 973 S.W.2d 586, 588-89 (Tenn. 1998); *State ex rel. Newsom v. Biggers*, 911 S.W.2d 715, 717 (Tenn. 1995); *State By and Through Town of South Carthage v. Barrett*, 840 S.W.2d 895, 898 (Tenn. 1992).

defined to include the components necessary to exercise judicial power, the most obvious being a judge. The language of Art. VI, § 1 reinforces this basic concept. "The Constitution recognizes that the judicial power is a combination of judges and courts. *Summers* (Drowota, J. concurring), 764 S.W.2d at 189 n.3.

The discussion in the *Summers* concurrence of these principles and their interrelationship is worth revisiting at some length:

> The issues in this case involve one of the most fundamental principles of American constitutional government, an independent judiciary. Several components must be clearly understood for the resolution of these questions, not the least of which is the relationship of municipal governments to the State government and how that relationship is affected by the principles of separation of powers. The exercise of the essential powers of government is divided by the Constitution at the local level, despite some constitutional tolerance of endowing local governing bodies or officials with limited judicial capacities. Article II, § 2, expressly contemplates such tolerance, but the judicial power itself has defining characteristics and when exercised it must be exercised independently of the other branches, just as each of the other powers must operate. Restraints on government are as necessary, perhaps more necessary, in one's home town as in the State capitol.
>
> . . .
>
> The primacy of these fundamental principles [including separation of powers] is undisputed but because the defining powers of each department are not always readily identified, recognizing an encroachment by one department upon another is sometimes difficult. What is necessary is to find the operating principles at stake in any given case and determine their application to those circumstances based on the evils against which they were intended by the people of the state to provide protection. Those principles decide the case or controversy presented by the facts.
>
> When the thirteen colonies declared their independence from Britain in 1776, one of "the causes which impel[led] them to the separation" was that the King of Great Britain had "made judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries." Not only had the recent history of the colonies demonstrated that one of the most immediately oppressive and dangerous instruments of repression was a court subject to arbitrary political whims rather than to the dictates of law, but the history of Europe provided glaring examples of the extent to which judicial power could be abused. The Star Chamber and the Inquisition are sufficient for the point. Before a court whose purpose is to achieve a predetermined, unguided and unrestrained objective, no individual can hope to stand and receive a fair hearing. A court acting in accord with well-defined procedures and pursuant to the authority of a restraining Constitution and the rule of law, independent of the political system for its term of service and its compensation, was considered essential to the success of a constitutional system and to the preservation of fundamental rights. As this Court stated at the time of the adoption

of the Constitution of 1834, "[t]he independence of the judiciary ought to be anxiously preserved unimpaired; not on account of the individuals who may happen to be judges- -they are nothing- -but on account of the security of life, liberty, and property of the citizen." *Fisher's Negroes v. Dabbs*, 14 Tenn. 119, 139 (1834).

Article VI, § 1, of the Tennessee Constitution states that "[t]he judicial power of this State shall be vested in one Supreme Court and in such Circuit, Chancery and other inferior Courts as the Legislature shall from time to time, ordain and establish; in the Judges thereof, and in Justices of the Peace."*

> *fn 3. The Constitution recognizes that the judicial power is a combination of judges and courts. See, e.g., *In re Cumberland Power Co.*, 147 Tenn. 504, 508, 249 S.W. 818, 819 (1923); *Jackson, Morris & Co. v. Nimmo & Thornhill*, 71 Tenn. 597, 608-610 (1879).
>
> . . .

While "[i]t is well-settled that the Legislature has the power not only to create inferior courts under the constitutional provision but to diminish or to enlarge or to transfer their jurisdiction in the interest of efficiency and economy," *Duncan v. Rhea County*, 199 Tenn. 375, 385, 287 S.W.2d 26, 30 (1955), "[a] court is an instrumentality of sovereignty, the repository of its judicial power, with authority to adjudge as to the rights of person or property between adversaries. **The presence of a judge or judges is necessary as an essential element of a court.**" *Mengel Box Co. v. Fowlkes*, 135 Tenn. 202, 206, 186 S.W. 91, 92 (1916). **Thus, the judicial power entails the exercise of judicial discretion, that is, "[i]n its narrower sense it is the capacity of the individual judge presiding over a particular court** to perceive and apply to the facts of each case in judgment the law of the land, so that in each case the rights of the parties under the facts of the case may be declared and enforced according to the law of the land." *Scott v. Marley*, 124 Tenn. 388, 395, 137 S.W. 492, 493 (1911). Once a court is established, the judicial power of Article VI, § 1, vests in it as "an independent power, and, where it has jurisdiction, a sovereign power, just as much as the legislative itself." *Fisher's Negroes v. Dabbs*, *supra*, at 159.

> "In any court, however, whatever decree the court shall give must be the result of its own judgment, in the performance of the functions assigned it by the constitution. No other department of government has the right to indicate or dictate what that judgment shall be. This would be to usurp the judicial function, confided exclusively by the constitution to the judicial department."

*Perkins v. Scales*, 2 Shannon's Tenn. Cases 235, 237 (1877). The judgment of a court operates directly upon a person and each person's case must be determined on the facts pursuant to the applicable law. To protect the party brought before a court,

the judge must not only be impartial but must be independent of the will or whim of the political departments. As Justice Freeman recognized in his dissenting opinion in *State ex rel. Coleman v. Campbell*, 3 Shannon's Tenn. Cases 355, 376-377 (1875), **"a system of courts is an anomaly without judges, would be a mere abstraction with nothing of substance in it- - is too thin and shadowy for the practical work of a constitution of government for a state. The system of necessity involves the officers as well as the offices [of] the judges or else we can have no courts."** Continuing, Justice Freeman then emphasized that judicial independence is sacrificed if "the judge will hold his office at the pleasure of a few men . . . [who could terminate the office] because the judge had dared, in the discharge of his duty, to refuse to bend his will, or subserve his personal ends, or lend the aid of the judiciary to . . . personal aggrandizement." *Id.*, at 390-391. **In other words, the performance of the judicial function and the office of the judge merge to sustain that independence necessary to operate as a check and balance on the other branches of government.** *See*, *e.g.*, *In re Cumberland Power Co.*, 147 Tenn. 504, 507-508, 249 S.W. 818, 819 (1923). Ultimately, therefore, the evil to be avoided by establishing an independent judiciary is that

> "[i]f the legislature, possessing a large share of executive power, be permitted to exercise judicial power also, or control the action of judges within their peculiar sphere, the liberty of the citizens, under the government of good legislators, would be in imminent peril, and under bad ones would be entirely destroyed."

*Fisher's Negroes v. Dabbs*, *supra*, at 138. To assure an independent judiciary, the office of a judge must be secured against the political caprice of other departments of government. *See*, *e.g.*, *The Judges' Salary Case*, 110 Tenn. 370, 388-389, 75 S.W. 1061, 1065 (1903); *State ex rel. Orr v. Leonard*, 86 Tenn. 485, 488-489, 7 S.W. 453, 454-455 (1888). No judges, no courts may be "dependent upon [another's] pleasure, and subject to be used as instruments, so long as they were obedient, and when they were otherwise, subject to be turned off, and more pliant ones put in place. Were this [practice] ever sanctioned, we might presently fall on the old evil." *Smith v. Normant*, 13 Tenn. 271, 273 (1833).

*Summers v. Thompson* (Drowota, J. concurring) , 764 S.W.2d at 188-89(bold emphasis added).

## III. DELEGATION OF AUTHORITY TO CREATE OR ESTABLISH A COURT

As noted above, the parties agree that the Tennessee Constitution prohibits the legislature from delegating the authority to "ordain and establish," or create, inferior courts. An important component of the decision to establish a new court is a determination of the need for such a court. As the Tennessee Supreme Court explained in 1892, "**the Legislature is the sole judge of the necessity or expediency of establishing [inferior] courts.**" *Ellis v. State*, 20 S.W. 500, 502 (Tenn. 1892) (emphasis added).

Thus, no one would disagree with the conclusion that if the General Assembly were to delegate to a local governmental entity the power to decide whether a **court** was needed, clearly, such delegation would violate Art. VI, § 1. The question is whether Section 20 of the Private Act which contained the language, "[t]he Judgeship of said Second Division shall remain vacant until the Quarterly County Court of Shelby County shall determine the need therefor," also constituted an impermissible delegation of authority to create a court under Art. VI, § 1.

The treatment of similar legislative acts with regard to Art. VI, § 1 is instructive. In *Haywood v. Davidson County Workhouse*, an inmate filed a petition for writ of habeas corpus on the ground that the order sentencing him was void. According to the inmate, the private act which created the court rendering the order violated Art. VI, § 1 of the Tennessee Constitution in several respects, including that it delegated to the mayor and city council the "power and duty" to establish the court. 259 S.W.2d at 160. The private act in *Haywood* provided "that the Mayor and City Council shall by ordinance provide for a Juvenile and Domestic Relations Court." *Id.* The Tennessee Supreme Court found that the private act did not create the court but, instead, delegated to the mayor and city council the authority to do so. Consequently, it was an unconstitutional delegation of authority reserved exclusively to the General Assembly.

In *Jackson, Morris & Co.*, 71 Tenn. 597 (1879), the Tennessee Supreme Court found that an act which expanded the jurisdiction of chancery courts to include what had theretofore been exclusively vested in circuit court, was constitutional, relying principally on the language of Art. VI, § 8. In discussing the various arguments made against the act, the Court had occasion to discuss the two "elements of the complex ideas embraced in the words 'circuit and chancery court'" as used in Art. VI, § 1. *Id.* at 607. First, the Court found that one "distinct fact or element which are conveyed when we speak of these courts" is that **both courts have "a judge or chancellor performing the judicial functions** by means of certain forms or machinery in a certain mode."[10] *Id.*

> The distinction attempted to be pointed out is between the **existence of a court as a concrete fact**, and the jurisprudence which that court administers by the agencies of its organism.

*Id.* at 609 (emphasis added). While the Court in *Jackson, Morris & Co.* did not explicitly hold that whether a court existed "as a concrete fact" depended on **whether the court had a judge performing judicial functions**, a full and fair reading of the entire opinion indicates that was, in essence, a holding of the court.

In *Mengel Box*, 186 S.W. 91, 91-92 (1916), the Tennessee Supreme Court was presented with the question of whether a private act provided for a new court or was simply an enlargement of the

---

[10] The second element discussed by the Court was "jurisdiction or power to act judicially on a greater or less number of rights." *Id.* at 608. While jurisdiction is an "essential element" of a court, whether the jurisdiction be wide or narrow, it is, nevertheless, a court, *i.e.* the breadth of jurisdiction is not a defining characteristic as long as jurisdiction exists. *Id.* The Court concluded from the two sections of Article VI that "preservation of these courts, with their distinctive features, modes of procedure and organism, substantially as independent and separate agencies for the exercise of the judicial power was intended - - the courts to remain intact," but their jurisdiction could be changed. *Id.*

jurisdiction of an existing court. In deciding that the private act created a new tribunal, the Court discussed the constitutional components of courts in Tennessee:

> A court is an instrumentality of sovereignty, the repository of its judicial power, with authority to adjudge as to the rights of person or property between adversaries. **The presence of a judge or judges is necessary as an essential element of a court.** A "court" was defined by Bacon to be "an incorporeal being, which requires for its existence the presence of the judges or a competent number of them."

> The term as defined by Mr. Bouvier in his Law Dictionary (quoted by this court in *Railroad v. Crider*, 91 Tenn. 489, 505, 19 S.W. 618, 622), is this:

>> "The presence of a sufficient number of the members of a body in the government, to which the public administration of justice is delegated, regularly convened in an authorized place, at an appointed time, engaged in the full and regular performance of its duties."

186 S.W. at 92 (emphasis added).[11]

In *In re Cumberland Power Co.*, 249 S.W. 818, 821 (1923), the Tennessee Supreme Court found that the Railroad and Public Utilities Commission was not an inferior court vested with judicial power such that the Supreme Court could entertain an appeal from it. As part of that analysis, in discussing Art. VI, § 1, the Supreme Court found:

> It is apparent that the word "court," as used in our Constitution, means the medium for the exercise of the judicial power of the state, and connotes the ordinary attributes of judicial tribunals, **certainly a judge or judges** and the machinery necessary for the judicial administration of justice.

*Id.* at 819 (emphasis added).

Finally, as set out in the excerpt from *Summers v. Thompson* quoted extensively earlier in this opinion, our Supreme Court has also held that **"a system of courts is an anomaly without judges"**
*State ex rel. Coleman v. Campbell*, 3 Shannon's Tenn. Cases 355, at 377, and has stated that the Constitution "recognizes that the **judicial power is a combination of judges and courts**. See, e.g., *In re Cumberland Power Co.*, 147 Tenn. 504, 508, 249 S.W. 818, 819 (1923); *Jackson, Morris & Co. v. Nimmo & Thornhill*, 71 Tenn. 597, 608-610 (1879)" *Summers* (Drowota, J. concurring), 764 S.W.2d at 189 n.3 (emphasis added).

---

[11] The *Mengel Box* definition of a court was relied upon by the Court of Appeals in *State v. Bush*, 626 S.W.2d 470, 472-73 (Tenn. Ct. App. 1981), wherein it found that a judicial commissioner was not a court under Art. VI, § 1. *See also Ridout v. State*, 30 S.W.2d 255, 263 (Tenn. 1930) (Cook, J. *dissenting*) (citing the definition of court from *Mengel Box* and relying on Arkansas caselaw for the proposition that "the time and place designated by law and the presence of the judge there acting judicially are the union and combination of circumstances which constitute a court").

Thus, "court" as used in Art. VI, § 1 is defined to include the necessary elements for exercise of judicial power, specifically including a judge. Further, the term "court" in Art. VI, § 1 is to be construed functionally and not in a manner resting on formalities. The term "court" includes the means through which judicial power is exercised. By necessity, that includes a judge. Consequently, in order to "ordain and establish" a court under Art. VI, § 1, the legislation creating or establishing the court must make provision for a judge. The legislature cannot establish a court without also establishing a judgeship. Section 20 does not create or establish a judgeship for division 2. In fact, the General Assembly recognized the difference in its treatment of the two divisions, stating that the judge of division 2 "shall be subject to all of the provisions of this Act in the same manner **as is the Judge provided for in this Act**."

For the same reasons, the decision of whether a new court is necessary, which is the sole prerogative of the General Assembly, " *Ellis*, 20 S.W. at 502, cannot be separated from the decision of whether a new judgeship is necessary. A court cannot be created or established without the concomitant creation of a judgeship. Under the decisions discussed above, we see no distinction between delegating the authority to decide whether a court is needed, which undisputedly would violate Art. VI, § 1, and delegating the authority to decide whether an **essential component** of a court, *i.e.*, a judge, is needed. Without a judge, there is no court.

By the language in Section 20, the legislature gave the Commission the power to determine when a judge was needed for division 2. By leaving the decision to the Commission of **when** a second judgeship would be necessary, the legislature also delegated to the Commission authority to decide **if** it would **ever** be necessary. Because a court does not exist without a judge, the legislature, in effect, left to the Commission the decision of whether division 2 would, in fact, come into existence, *i.e.*, be established or created.

Division 2 of the juvenile court has not existed, "as a concrete fact," for the last 40 years because it has had no judge to perform judicial functions. *See Jackson, Morris & Co.*, 71 Tenn. at 609. The legislature did not complete establishment of division 2 but, instead, left the crucial decision of its necessity with the Commission.

Because in Section 20 of the Private Act the legislature delegated to the Commission the power to decide whether a judge for division 2 was needed, which is the equivalent of delegating to the Commission the authority to establish or create division 2 of the juvenile court, we conclude that Section 20 is an unconstitutional delegation of power reserved to the General Assembly by Art. VI, § 1 of the Tennessee Constitution.

The Commission argues that an attractive and simple interpretation of Section 20 would conclude that the division 2 court was fully created in 1967, has existed during the last 40 years, and the fact that the Commission is to determine when a judgeship is needed to fill the court does not detract from the establishment of the court in 1967. This interpretation would require, however, a definition of "court" in Art. VI, § 1 that is contrary to established law. "Court" means "the medium for the exercise of the judicial power of the State, and connotes the ordinary attributes of judicial panels, **certainly a judge or judges** and the machinery necessary for the judicial administration of

justice." *In re Cumberland Power Co.*, 249 S.W. at 819; *see also Mengel Box Co.*, 186 S.W. at 92 (holding that "[t]he presence of a judge or judges is necessary as an essential element of a court.")[12]

Additionally, such an interpretation would elevate form over substance, contrary to the Supreme Court's directive that we look at "court" functionally. The Commission's argument presumes that the legislature actually created or established division 2 through the language of Section 20. We have concluded, however, that the General Assembly did not create or establish a court because it did not provide for a judgeship. While the General Assembly may have begun the process of establishing a court, it did not complete it. Because we find that division 2 was not created in 1967 and, in fact, has not existed since that time, we find this argument by the Commission inapplicable.

The Commission correctly argues that if Section 20 is susceptible to varying interpretations we must resolve the matter recognizing the interpretation that upholds the constitutionality of Section 20. In fact, we have set out authority for that principle earlier in this opinion. However, the language in Section 20clearly requires the Commission to "determine the need" for the judgeship. Another interpretation is simply not reasonable. Furthermore, the 40 year history of Section 20 has proved that any other interpretation is a distinction without substance. Division 2 could exercise no judicial authority or perform any judicial functions until the Commission decided it was needed.

## IV. OPEN MEETINGS ACT

Judge Person also appeals the trial court's determination that his Open Meetings Act claim was moot because the November Resolution had been rescinded. The trial court also found that, even if it that claim were not moot, remedies for violation of the Open Meetings Act were discretionary with the trial court, and the trial court found that no remedies were appropriate. On the basis of these holdings, the trial court quashed Judge Person's request for expedited discovery on the issue of violation of the Open Meetings Act.

The November Resolution was passed on November 6. Shortly thereafter, on November 16, Judge Person filed this suit challenging the November Resolution and Chapter 20 on a number of grounds, including an alleged violation of the Open Meetings Act. Two days after Judge Person filed suit, the Commission unanimously rescinded the November Resolution.

---

[12]Because we have concluded that the legislature delegated the power to determine whether and when a judgeship was needed, which is the equivalent of deciding whether a court is needed, the Commission's argument regarding legislative delegation is inapplicable. Further, the cases relied upon by the Commission in support of that argument do not involve delegation of the authority to create courts in derogation of Art. VI, § 1. *Clark v. State ex rel Bobo*, 113 S.W.2d 374 (Tenn. 1938) (allowing county referendum on liquor does not violate rule that prevents the legislature from delegating its power to make a law); *Lobelville Special School Dist. v. McCanless*, 381 S.W.2d 273, 274 (Tenn. 1964) (allowing delegation of authority to establish education standards does not violate rule that prevents the legislature from delegating its power to make a law); *First Utility Dist. v. Clark*, 834 S.W.2d 283, 287 (Tenn. 1992) (allowing delegation of authority to fill vacancies for commissioners for county's utility district).

There were two consequences of this rescission. First, the subject of the lawsuit, the November Resolution, was no longer in existence and no longer in effect. Second, Judge Person promptly received the most significant relief he requested in his Open Meetings Act claim: nullification of the November Resolution. In spite of the Commission's prompt decision to rescind the November Resolution, Judge Person argues that the trial court erred when it found his Open Meeting Act claim to be moot.

A case will be considered moot if it no longer serves as a means to provide some sort of relief to the party who may prevail or if it no longer presents a present, live controversy. *McCanless v. Klein*, 182 Tenn. 631, 188 S.W.2d 745, 747 (1945). Where a matter has been resolved, that claim must be dismissed at moot. *County of Shelby v. McWherter,* 936 S.W.2d 923, 931 (Tenn. Ct. App.1996).

> A case is not justiciable if it does not involve a genuine, continuing controversy requiring the adjudication of presently existing rights. *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 193 (Tenn. 2000); *Ford Consumer Fin. Co. v. Clay*, 984 S.W.2d 615, 616 (Tenn. Ct. App. 1998).

> A moot case is one that has lost its justiciability because it no longer involves a present, ongoing controversy. *McCanless v. Klein,* 182 Tenn. 631, 637, 188 S.W.2d 745, 747 (1945); *County of Shelby v. McWherter,* 936 S.W.2d 923, 931 (Tenn. Ct. App.1996). A case will be considered moot if it no longer serves as a means to provide some sort of judicial relief to the prevailing party. *Knott v. Stewart County,* 185 Tenn. 623, 626, 207 S.W.2d 337, 338-39 (1948); *Ford Consumer Fin. Co. v. Clay,* 984 S.W.2d at 616. Determining whether a case is moot is a question of law. *Charter Lakeside Behavioral Health Sys. v. Tennessee Health Facilities Comm'n,* 2001 WL 72342, at *5; *Orlando Residence, Ltd. v. Nashville Lodging Co.,* No. M1999-00943-COA-R3-CV, 1999 WL 1040544, at *3 (Tenn. Ct. App. Nov.17, 1999) (No Tenn. R. App. P. 11 application filed).

*Alliance for Native American Indian Rights in Tenn., Inc. v. Nicely*, 182 S.W.3d 333, 338 (Tenn. Ct. App. 2005).

Determining whether a case or an issue has become moot is a question of law, reviewed *de novo* with no presumption of correctness. *Id.*; *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993). Unless the case fits within one of the recognized exceptions to the mootness doctrine,[13] courts will dismiss a question or a claim that has become moot.

---

[13]Courts have recognized several exceptions to the mootness doctrine. Exercising their discretion, *McIntyre v. Traughber,* 884 S.W.2d at 137, *Dockery v. Dockery,* 559 S.W.2d 952, 954 (Tenn. Ct. App.1977), they have declined to dismiss cases when the issue involves important public interests, when the issue is important to the administration of justice, and when an issue is capable of repetition but will evade judicial review. *State ex rel. Anglin v. Mitchell,* 596 S.W.2d 779, 782 (Tenn.1980); *New Rivieria Arts Theatre v. State,* 219 Tenn. 652, 658, 412 S.W.2d 890, 893 (1967); *LaRouche v. Crowell,* 709 S.W.2d 585, 587-88 (Tenn. Ct. App.1985).

Under the Open Meetings Act, the primary relief to be afforded is the vacating of any action taken at a meeting in violation of the Act. Such action "shall be void and of no effect." Tenn. Code Ann. § 8-44-105. The issue then is whether the fact that the Commission rescinded the November Resolution rendered the Open Meetings Act claim moot.

Where, as here, the Open Meetings Act dispute is promptly resolved and the primary remedy sought, *i.e.,* nullification of the action taken allegedly in violation of the Act, is achieved, this court has held that the claim based on the Act is moot.[14] *Cathey v. City of Dickson*, 2002 WL 970429 at *5, (Tenn. Ct. App. May 10, 2002) (holding that repeal of annexation ordinance rendered Open Meetings Act claim regarding passage of the ordinance moot, citing Tenn. Code Ann. § 8-44-105 as the available remedy). In *State ex rel. DeSelm v. Jordan*, No. E2007-00908-COA-R3-CV, 2008 WL 4254226 (Tenn. Ct. App. Sept. 12, 2008), this court addressed an Open Meetings Act claim seeking to invalidate interim appointments to fill offices vacated by term-limited officers. The court held:

> In light of the fact that all of the officials that this action sought to have removed as term-limited no longer hold office, that their replacements have been ostensibly duly elected and inaugurated in accordance with Tennessee law, and that the Supreme Court clearly held in *Jordan* that the officials found to be term-limited in that case legitimately held office as de facto officers until there successors were named in accordance with law, all of the issues raised by the complaint [Open Meetings Act violations] are now moot.

2008 WL 4254226, at *6.

Similarly, in *Hicks v. Metropolitan Government of Nashville and Davidson Co.*, 1986 WL 10885 (Tenn. Ct. App. Oct. 3, 1986) (perm. app. denied Feb. 2, 1987), this court determined that the plaintiff's Open Meetings Act claim was moot since the action of the local government board that was alleged to have violated the Act had been superceded by later actions. "The actions which Plaintiff would have us declare void culminated in a one year lease of the fairground property to Defendant" and, since that lease had expired, the court reasoned that "no genuine and existing

---

[14]A related concept involves cure of any violation of the Open Meetings Act by subsequent action, usually a reconsideration of the action in a meeting that complies with the Act. *See Dossett v. City of Kingsport*, 258 S.W.3d 139, 149-50 (Tenn. Ct. App. 2007); *Metropolitan Government v. Kimbro*, No. 01-A-01-9005CV00174, 1990 WL 154646 (Tenn. Ct. App. Oct. 17, 1990); *State ex rel. Kennametal, Inc. v. City of Johnson City*, (Tenn. Ct. App. Dec. 21, 1978). When a public body re-enacts or redoes a previous action after a full and public discussion of the matters discussed in meetings held allegedly in violation of the Act, the new action or ordinance will not be nullified even if it originally was adopted or taken without compliance of the Open Meetings Act. The cure doctrine was explained in *Neese v. Paris Special School District*, 813 S.W.2d 432, 436 (Tenn. Ct. App. 1990):

> We do not believe that the legislative intent of this statute [Tenn. Code Ann. § 8-44-105] was forever to bar a governing body from properly ratifying its decision made in a prior violative manner. However, neither was it the legislative intent to allow such a body to ratify a decision in a subsequent meeting by a perfunctory crystillization of its earlier action. We hold that the purpose of the act is satisfied if the ultimate decision is made in accordance with the Public Meetings Act, and if it is a new and substantial reconsideration of the issues involved, in which the public is afforded ample opportunity to know the facts and to be heard with reference to the matters at issue.

controversy requiring present adjudication of present rights exists with regard to this issue." 1986 WL 10885, at *4.

In none of these cases, however, is there any mention of remedies available under the Act other than the nullification provision in Tenn. Code Ann. § 8-44-105. That is the crux of Judge Person's argument on this issue: that he requested additional remedies that are allowed under the Act and he should have been permitted to proceed with proving a violation. Tennessee Code Annotated § 8-44-106, titled "Enforcement - Jurisdiction," provides:

> (a) The circuit courts, chancery courts, and other courts which have equity jurisdiction, have jurisdiction to issue injunctions, impose penalties, and otherwise enforce the purposes of this part upon application of any citizen of this state.
>
> (b) In each suit brought under this part, the court shall file written findings of fact and conclusions of law and final judgments, which shall also be recorded in the minutes of the body involved.
>
> (c) The court shall permanently enjoin any person adjudged by it in violation of this part from further violation of this part. Each separate occurrence of such meetings not held in accordance with this part constitutes a separate violation.
>
> (d) The final judgment or decree in each suit shall state that the court retains jurisdiction over the parties and subject matter for a period of one (1) year from date of entry, and the court shall order the defendants to report in writing semiannually to the court of their compliance with this part. (emphasis added).

The enforcement tools in Tenn. Code Ann. § 8-44-106 are available and/or required only if a violation of the Act is found to have occurred. Further, the Open Meetings Act is remedial in nature and permits courts "to issue injunctions, impose penalties, and otherwise enforce the purposes of" the Act. Tenn. Code Ann. § 8-44-106(a); *Dorrier v. Dark*, 537 S.W.2d 888, 891 (Tenn.1976). The Tennessee Supreme Court has stated that the Act's statutory scheme "incorporate[s] some degree of judicial discretion in fashioning an appropriate remedy to further the purposes of [the] Act." *Forbes v. Wilson County Emergency Dist. 911 Bd.*, 966 S.W.2d 417, 421 (Tenn. 1998).

The trial court herein determined that the Open Meetings Act claim had been rendered moot by the rescission of the November ordinance. Consequently, no judicial decision was made regarding the alleged violation. We do not believe, however, that the trial court was required to proceed to hear the Open Meetings Act claim simply because relief other than nullification was requested. Tennessee Code Annotated § 8-44-106 provides for additional enforcement measures; it does not create or expand a cause of action.

Herein, the Commission acted within two days of the filing of this lawsuit claiming a violation of the Open Meetings Act. The Commission's rescission of the November Resolution rendered that resolution null and void. In fact, the Resolution that was the subject of the claim based

on the Act, as well as part of the declaratory judgment claim, no longer existed. The validity of the Resolution was no longer a present, live controversy.

Additionally, where, as here, the governmental body acts quickly and decisively to correct any mistake in its procedure, the primary goal of the Open Meetings Act has been accomplished. We do not believe that the legislature intended to hinder such correction of errors, but rather to encourage it. *See Neese v. Paris Special School District*, 813 S.W.2d at 436 (explaining the legislative intent relating to a cure of a violation of the Act).

The trial court's dismissal of the Open Meetings Act claim as moot is affirmed.

## CONCLUSION

On the constitutional issue, the trial court is reversed, and Section 20 of the Private Act is hereby found to be unconstitutional under Art. VI, § 1. Consequently, the February Resolution enacted pursuant to Section 20 is invalid and of no effect. The trial court's dismissal of the Open Meetings Act claim is affirmed. Costs of appeal are assessed against the appellees, the Commission and Mayor, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, P.J., M.S.